Mr. Berman. Thank you, Your Honor. Good morning and may it please the court. I'm Stuart Berman for the appellant Earl Griffin, Jr. On September 5th, 2019, police executed a state search warrant at Mr. Griffin's mother's house in Calvert County, Maryland, what we refer to in the papers as the 6740 residence, but also its vehicles outside of it. They didn't find any contraband in the house, but outside in a green Tahoe vehicle registered to Mr. Griffin, they found drugs in a center console and they found a gun in a bag on the floorboard of the rear passenger side. The government charged Mr. Griffin with three crimes. The jury acquitted him of possession with intent to distribute the drugs. They acquitted him of a related 924C charge, but they convicted him of a felony possession charge relating to that firearm in the back seat, and he received a 15-year mandatory minimum sentence under the Armed Career Criminal Act. I want to focus in this argument on three key points, particularly number one, which is if there was no probable cause for the warrant, then the district court should have suppressed that firearm. Second, that there was insufficient evidence that Mr. Griffin knowingly possessed the firearm and the district court should have granted a Rule 29 motion. And third, that applying the Erlinger case, which came down after the district court proceedings, this court should find plain error and reverse the mandatory minimum sentence because the indictment didn't charge and the jury didn't find three prior drug offenses on separate occasions, then the error was not harmless. As to the remaining issues and the briefs, I would address that in our briefs, but I want to start with the warrant issue. Judge Hazel, can I just ask, this is literally just a clarification question because I want to make sure we're on the same page. You're not arguing that the execution of the warrant violated what the warrant authorized. The argument is just the initial issuance of the warrant. Is that right? Correct, Your Honor. Thank you. That's all I want. Yep. And Judge Hazel, to begin with that point, recognized that the affidavit for the warrant to search the 6740 residents and vehicles, quote, may not be the strongest search warrant affidavit I've ever read. That's in Appendix 243. But he gave the government and the issuing judge the benefit of the doubt and he found a substantial basis for the issuing judge to have found probable cause and respectfully, he was wrong because probable cause requires an affiant to show a fair probability that contraband or evidence of a crime will be found in a particular place. That means the 6740 residents itself, not the Kent Bottom area, generally. You know, the Fourth Amendment requires probable cause for a specific house, even in a high crime area, as this court has recognized in its reasonable suspicion cases. Now, you have to have particularized evidence for a specific place. When we submit that even with deference to the issuing judge, even allowing for reasonable inferences, the warrant here lacked a substantial basis for probable cause. And even though this affidavit was lengthy, it said very, very little about the 6740 residents. In fact, when you strip out the portions that don't relate to 6740, it's accurate, I think, to say this was a bare-bones affidavit. Search warrant affidavit made only three allegations about 6740. One of them was hopelessly stale, which is that there was a search in 2006, 13 years earlier, that resulted in the seizure of drugs and ultimately in the conviction of Mr. Griffin. The other two, one was from April of 2019, five months before the warrant, in which officers allegedly observed that Mr. Griffin's son did a hand-to-hand transaction in the yard of the residence, which yielded 0.5 grams of cocaine base. But the application did not state that the person believed to be Mr. Tyleek Griffin, that is the defendant's son, was seen entering or exiting the 6740 residence before or after the suspected sale. That's a joint appendix 44. The only other thing in this affidavit about the 6740 residence was that in August of 2019, a month before the warrant, officers allegedly observed Mr. Griffin's brother Desmond was present at Kent Bottom, the neighborhood, not the house, during several suspected CDS transactions, none of them proven because there's no evidence, there's no representation about any arrest or any seizure of drugs, and was seen walking in and out of 6740 before or after these suspected transactions. That's it. That's all that this affidavit says about 6740. Look, I understand the court has upheld warrants to search suspects' residence because of evidence of suspects' involvement in drug trafficking, combined with reasonable suspicion that drug traffickers store evidence in their house. 6740 wasn't Tyleek Griffin's house. The affidavit, in fact, acknowledges that, and there was no fresh evidence that Desmond Griffin sold drugs. And Earl Griffin's 2006 foot, as I said, was 13 years old, and the affidavit also referenced certain 2014 and 2015 offenses of his that didn't take place there. I think it's notable what the district court said that the Tyleek, at Joint Appendix 244, it said that the Tyleek Griffin and Desmond Griffin events by themselves wouldn't be sufficient, but when taken as a whole, when looking at all the evidence that's in the affidavit about this ongoing, frankly, years-long drive-up drug shop there, even those just small connections to one of those houses, 6740, is sufficient to establish a substantial basis under which the judge could issue a finding of probable cause. Can I take you to the Leon question? Because the elephant in the room is even assuming you're right, this warrant was invalid, there's a Leon problem. And the way that you try to get around Leon is Lyles, and I think that Lyles seems pretty clearly distinguishable for two reasons, and I'd like to get your response. So first, the thing is that this court's opinion in Lyles emphasized the incredible scope of what the warrant authorized and how it had basically nothing to do with the probable cause. That was thing one we said in Lyles. And in two, in Lyles, the district court had granted suppression. Those seem like two pretty big differences, so why isn't that suggest that Lyles isn't super helpful for you on the Leon issue? Well, let me come at it this way, your honor. I think that with 20-20 hindsight, I would place less weight on Lyles and more on Doyle than Wilhelm. Really, Doyle, I think, is the best case on the good faith issue. I think it's pretty well established by this court's good faith cases that when we're in this context of looking at the probable cause issue, really we're talking about the third problem of the Leon exceptions, namely that we're supporting affidavit is so lacking in an issue of probable causes to render official belief in its existence entirely unreasonable. And again, even though this affidavit is more than 20 pages long, when you cut out the parts that don't relate to 6740, it's bare bones. And it's very much on point with the child pornography conclusion in the Doyle case where this court held that nothing indicated when or if child pornography existed in Doyle's home. We conclude that an objectively reasonable officer would not rely on a warrant application so devoid of necessary information and because reliance on the warrant was not objectively reasonable that good faith doesn't apply. And I think that's really the situation here. I mean, it's tempting to say, well, the officer did this lengthy affidavit that's got these photographs in it and so forth. But once you strip out all the things that relate just to the so-called bad neighborhood here and the other houses in the neighborhood, which are not where this evidence was seized, you just have these three items. You just have this 2006 seizure. You have this whatever it was in a yard not in the house in April 2009. And you have this incident in August about a suspected transaction where there's no proof of drugs involved. So we would submit both that there is a lack of probable cause and that applying particularly Doyle and Wilhelm that there's a lack of good faith here. So with that, let me turn to the constructive possession issue, which is constructive possession requires two things. It requires ownership, dominion, control over the contraband or in this case the vehicle where the contraband was concealed and knowledge of the presence of the contraband. And the government presented evidence that the car was registered to Mr. Griffin, that he had a key in his pocket and that there had been this text message from an unknown person about a 40 big boy, which an expert said meant the 40-caliber firearm. No witness saw Mr. Griffin with a gun. No witness heard him mention a gun. Didn't say anything to law enforcement about a gun. There was no surveillance of him with a gun. There was no statement by Mr. Griffin again about a gun. They presented DNA evidence. It didn't link him to the gun. There was no evidence about how long... These all sound like great jury arguments to me, but what I'm not sure they sound like is a good sufficiency argument because what you've told me is it's in front of your client's car house. It's registered to him. The only key that anyone locates is on your client. These seem to be hard arguments that he doesn't possess what's in the car. Well, to the extent that the court might conclude that that establishes that the jury could reasonably have found ownership dominion or control over the vehicle, that still doesn't address the question of knowledge. And it doesn't prove Mr. Griffin's knowledge that that firearm was there on September the 5th of 2019. How does the expert's testimony regarding the text messages go to the knowledge? The text message regarding the, I think was the expert testified that the buying, I guess, of the gun. Well, the text message was from three months earlier and assuming that, you know, you're reading all the inferences in favor of the jury's conclusion, the jury could have found that he had knowledge as of July 6th of 2009 that there was this 40 big boy, 40 caliber firearm out there. I would respectfully submit that that is not sufficient to establish his knowledge that that firearm was in that car as of September of 2019, several months later when the warrant was executed. Can I take you to the ACCA issue? Certainly, that's where I was headed.  Let me, so I understand there are two issues here, which is what, how many qualifying convictions he has and whether they were on occasions different from each other, broadly speaking, right? So this question is about the first one of those. What is your best authority for the proposition that if the government doesn't file a 28 J letter, it has waived, waived reliance on intervening Supreme Court authority that just directly answers a question? Yeah, Your Honor, I made the best argument I could regarding that in our supplemental brief. This court held in U.S. v. White that when an intervening decision of this court or the Supreme Court affects precedent relevant to a case on direct appeal, an appellate may raise... Wait, wait, hold on. What was the word you just said? May time... No, no, no, before that. ...affects precedent relevant to a case pending on direct appeal. Sorry, the word was appellant, right? Yes.  Is the government the appellant in this case? The government is not the appellant. Is the government seeking to alter the district court's  The government is not seeking to alter... How can the appellee waive reliance on an intervening Supreme Court authority that means they're just right about an issue? Well, Your Honor, no, that's why I was more than willing to rest on my... Understood, sorry. So let's take the occasion, so the occasions question, let's move, that's fine. On the occasions question, you agree this is totally forfeited. Well, I agree that it was, I agree that we're on a plain error standard. That's right. That's all I meant. We're in 52B land, Alano, Johnson, Cotton, all those cases. Yeah, you know, trial counsel mentioned Wooden at the sentencing hearing and he came close to identifying the occasions clause issue, but I would concede that he did. Okay, so and under Brown, we know this is capable of being under plain error because you actually, it's now your burden to prove prejudice. How can you possibly prove prejudice? Well, Your Honor, I think that, you know, if we apply the standard, which I submit ought to be the Sixth Circuit standard in Cogdill, that if just one reasonable juror could find reasonable doubt about whether the offenses were committed on... That's a harmless error standard. That's not a plain error standard. Well, I submit that if the error here is that the defendant's Fifth Amendment rights were violated by not being charged in an indictment and the Sixth Amendment arguments were violated by not having a jury make a finding as to the occasions clause issue, that that affects substantial rights. No, no, but that is the precise argument that United States versus Cotton rejected after apprending. I understand the point. I submit, Your Honor, and if you look at the, and I see my time is over. If I could just finish answering your question, I submit that if you look at the various cases that have come down in other circuits since Erlanger, you know, there's no barrier to recognizing a plain error that is not harmless in situations where the occasions clause issue was not initially raised below. And I see my time is up for a short. Thank you, Mr. Berman. Mr. Hagen? Good morning, Your Honor. May it please the Court. Timothy Hagen on behalf of the United States. I did not realize that I would need my water. Apologies. Your Honor, I'd first like to address Mr. Berman's argument with respect to probable cause, and then I'd like to address good faith that Judge Heitens had raised. Obviously, the government's position, as we set forth in our briefs, is that there was probable cause in this affidavit, but that is obviously not the standard that this court would need to find to affirm on that issue. It's that Judge Klag had had a substantial basis to come to the conclusion that there was probable cause to search 6740, the residents in this case, as well as the other vehicles that were noted with respect to Part B of JA-51, which was entering and searching any portions of the dirt driveway that is contained on those two other residences on the side, 6790 and 6738. Your Honor, as this Court has noted, the Court has to pay great deference to the judicial officer who issued the warrant in this case, and here there is a substantial basis that there was probable cause. As we've noted in our papers, there were not just the overwhelming evidence of this being a stop-in, stop-drive-up drug shop, as Judge Hazel noted, as my friend Mr. Berman noted, but also we have the ties, the nexus to 6740 specifically, some of which were noted by Mr. Berman. I'd also note, though, that one of the important things to consider here is that when we look at the common sense and the entirety, the totality of the information that was received, Judge Klag did have a substantial basis to find that there was probable cause and that there was a nexus. Mr. Hagan, one of the problems with this, you know, you got 20 pages of, you know, I can't say you certainly had a lot of pages, but this seems to come dangerously close to a neighborhood, that a neighborhood labeled by the police, I suppose, based on this record, as a drug, open-air drug, that kind of thing. So the problem is you swoop in everybody who lives in that area and therefore just people who live there because that's their home and that's their neighborhood. So certainly we don't want that to be the basis for a probable cause. So with that in mind, looking at this, what's the, this was September 2019? Yes, sir. All right. What's the most recent thing that you have in that ward that happened at that address? What's the most recent meaning in terms of from that date going backwards? The most recent was referenced. The most recent thing that's observed that occurred at that address before September 2019, and that's in the four corners of those 20 pages. What's the most recent thing? You know, you got back 13 years, you go back, somebody was convicted of something, but tell me what's the most recent thing that's in there. Yes, your honor. At JA 144 and 145, there's a reference to an August 9th of that year, 2019. I'm sorry, your honor. No, go ahead. Tell me what happened at that address. That's in there. Now, I don't want you to, this is not analysis. This is just reading. What's in there that happened at that address on in August 2019? At that address, Desmond Griffin, who had been tied to that address, had been indicated previously in the affidavit as a street-level to mid-level distributor who was operating there, who had claimed 6740 as his address, who was previously arrested. On August 9th, during the day where there was observed significant vehicle and foot traffic coming in and out as a number of transactions are described at 144 and 145. In and out of what? Where? In and out of that location at 67, not the residence 6740, but the driveway that comes off of Route 2, that is about 50 yards from that residence. Going into that driveway belongs, wait a minute, the driveway belongs to the persons who own that address? No. No, no. That's a shared driveway, your honor. That's what I'm saying. Okay. So, that's my question is what happened at that address. That's a driveway that the public can use, correct? Yes, your honor. And they do use it, correct? Yes, your honor. So, go back now. Tell me again, my question is what's the most recent thing that you tied to that address, meaning that home or his curtilage? The description at 144 of the drug activity that was seen there on August 9th of 2019, when they described a significant amount of activity that is going on there that day, that's drug transactions that they're observing. But you told me that was at the driveway. You didn't say it was at the home or, my view, it doesn't say it happened at that home or property that's owned by the owner there. I mean, that's what I'm saying. You're really putting this in. It's all the neighborhood. Yes. If you live in a place that the police have designated as a drug open area, if you walk down the street, you could say, you know, I saw the person walking past that house and in that neighborhood, but then I'm in the swoop of how you have now defined what your probable cause is. You see, this is geographical now and neighborhoods as opposed to specificity of activity of drugs. So, going back to my question again, what is the most recent thing that you have? Because so far, you haven't answered that at all. You're trying to say a driveway, which you admit is not their property and all that curtilage, tell me what it is most recent to the date of the execution of that warrant at that address of curtilage. Give me another one because you're still talking about activity in the driveway and that doesn't cut it, not answer my question. Yes, your honor. On that date of August 9th, 2019, there's a reference to Desmond Griffin who was identified in the affidavit elsewhere as a street level to mid-level distributor operating there at that location, has claimed 6740 of his address when previously arrested, has been during the investigation seen entering and exiting 6740. Obviously, as your honor noted, there's also the reality of the previous time, the 13-year prior time where he was at 6740 during the execution of that search warrant where Mr. Earl Griffin was flushing marijuana. But finally, there's also this August 9th of 2019 that I just noted where all of this trafficking is occurring and Mr. Desmond Griffin and it's described at length in multiple paragraphs, Mr. Desmond Griffin is present for that several transactions and walking in and out of 6740 before and or after those transactions. So that's the most recent time, your honor, to the execution of that search warrant. So you observed him, he was observed actually possessing and distributing drugs? That is not what the affidavit says, your honor. It says that he's observed present at those transactions, multiple ones.  Correct, your honor. Present. And correct, your honor. So in other words, so if I live in a neighborhood that's open-air drugs and I certainly have a right to go outdoors at some point, I'm present, right? If I'm close enough to see it, correct? I don't know if close enough. Because you said present. I mean, in other words, you see words like present. Yeah, you are present. If you live there, right? If you live there, you are present. But you didn't say anything about drug trafficking in terms of distribution or possession. Correct, your honor. I didn't. So I'm there by association because of proximity? No, your honor. No, you're there, your honor, the way that this is described, and I think the fair inference that the judge can make, given that this is a place that contains mid-level and street-level distribution, and that Mr. Griffin, Desmond Griffin, is identified as a drug dealer in this area. For him to be present throughout multiple transactions that are occurring right there in front of him at that location and then going in and out of 6740, and that's what the surveillance has shown, is the most recent tie to the court's question to 6740. It's not the only tie, but it is the most recent tie. And that's why we think that Judge Klaget's finding is entitled to deference there because it is a reasonable and a substantial basis to find that there could be contraband at 6740 associated with the case going on right at its doorstep and constantly for a number of years, but also a lot even on that August 9th date where Mr. Desmond Griffin was referenced. I want to also, your honor, touch on the Leon question. As we look at the idea, and this also addressed, I think, Judge Gregory, your point about sort of the neighborhood dynamic. When the court takes a look at JA-164 and 165, these are overhead aerial views of what this location looks like. It is actually, would be a bit of a stretch to call it a neighborhood. It is small, and the area that they are looking to search is small. First, it's 6740 and the residence itself, but as we look at the reference in JA-151, and that's at B in the search warrant, entering and searching any portions of the dirt driveway that is contained on 6790 Kent Road and or 6738 North Solomons Island Road, what we are talking about is law enforcement, the affiant, looking at this and saying, it is not clear that the dirt drive where we see a lot of this open air drug market is actually entirely 6740's property. To the extent that this dirt drive touches on property that may be owned by addresses that don't use that drive because they have their own access to the main road, we are also asking the court for permission to search the portion of the driveway that may actually not be on 6740, but may actually technically be the property of 6790 or 6738. It's that kind of care. It's that kind of attention to detail in this that we would argue supports a good faith finding under Leon also. This is narrowly tailored to be 6740. The area that's right in front of it, the area that's right on its side where you can see in JA-165 and 164, the Chevy Tahoe, and the area that's just in front of it that goes to Solomons Island Road Route 2. What's important to note also is scale. Do you agree that under that warrant, you could search any car parked in that area that you just described? As we look at the area of... Whatever that area is you just described, you don't have to re-describe it. I think you did a great job of describing that because you do talk about vehicles in the area. That would have to mean that area, right? Any vehicle that's parked there, you could search it. Correct. That's what the warrant authorized, Your Honor. It wasn't limited by description of car, license plate number, or being an in-state tag or anything, or any description of the driver or passengers or whatever, that you could go in there. For example, if I just came by there and I just happened to stop, then you could go into my car, right? Isn't that right? It's not. There is no limitation. Is that right? Is that right? That is right, Your Honor. That's what I'm saying is so other people who are in the neighborhood, but you're in that area, you could just search my car for no reason at all, without any criminal suspicion at all. It's kind of a drag net, right, for that area. For this very, very narrow location where there's trafficking as a drive-up shop, it is- How many cars do you think could be parked in that area you just described? Ooh, Your Honor. Over 20, wouldn't it be over 20? 30? I think 20 is possible. I think 20 is- I think they would be stacked up, Your Honor, pretty bad up to Route 2 if we did 20, but I think that's possible. It's a lot of limit, yeah. That's pretty broad, isn't it? Well, I think it's actually- The areas where this is occurring is actually a little narrower, Your Honor. As we look at the tree line that sort of blocks the view from Route 2 down there, the area where you actually- Because you can't park at the trees. The area that you would actually have room to park there, this is a pretty narrow spot. Remember, as we look at one- I accept you have 20 cars. I think it had to be about at least 20 cars. So, it doesn't really matter in that warrant at all what the person is. They just stop there, a bill collector stop in there, a person who stopped there because they needed to get something out of their car, whatever, when they're visiting somebody. That's a pretty broad warrant in it for that sense, right? Because I'm talking about the vehicle. It's not just- That's broad for the vehicle. Why didn't it say someone parked in front? And I think we can understand that in front of that address. But to say that whole area, that's pretty broad, isn't it? It is broad. It was attempted to be narrowed by the affiant, who obviously didn't include sort of the rest of the driveway, for example. That's another 200 feet past the address, where nonetheless there had been, you know, reference in the affidavit to drug trafficking that could have touched that. So, these facts, as to the car, this doesn't even come close to Leon. Leon is the most stretched case in the history of American jurisprudence. Because if you look at the actual similar case, these officers did incredible work in terms of what they did in detail. And now, all you just say is, Leon, Leon, Leon, Leon. Just that one word, and all of a sudden, you just, that's fine. As long as, but no, we have to go back and look at it. That's just, you know, you could have, there's no limitation at all. You wanted to include any car that just came up there in that area, that you could just go into. And that's, anyway, but anyway, that's what I thought. I just want to ask you that, but it cleared my mind. That's exactly what it was. 20 cars or more, based on your search, and I accept your estimate. And without any connection with any drugs ever been there before, with their license or not, whatever would be, you could just go into it and without any restrictions. Not even saying seeing some contraband through the window, so it's not a plain view restriction at all. It's not anything at all. And that would go to the, going into his car with the gun. But go ahead, you go ahead and finish, I'm finished. Yes, your honor, the, I would note that, as the court noted, Leon does allow for officers to rely on a warrant issued by a neutral magistrate. They most often act in good faith. And there really isn't a basis to believe that these officers during, obviously, the execution, but also in obtaining the warrant, et cetera, that they weren't doing so. And if they did, if this court were to find that they ran afoul of the Fourth Amendment, despite their best efforts, and in this case, there's really no basis to believe that suppressing this evidence would produce anything that were just marginal or non-existent benefits. And in this case, we would argue that they are- There might be benefits to people, wait a minute, there might be benefits for people who live in those areas that somebody above their pay grade have called their area open drugs and therefore allows the Constitution to be exercised to a very limited aspect in terms of rights and protection of other neighborhoods. Very seldom we have crimes in other neighborhoods where you just say, well, ain't a car parked in that area we described we can go into? It's more particularized. But here, so you, because you said that we don't see any benefit, but it might be a benefit if you happen to be somebody, you've lived there and your grandchildren live there and they're still there, that's where you live. So I do see that's a possible benefit. I think that's one of the things. How do you see the quality of life and the importance of other neighborhoods that people may not even go into but somehow label as drug areas? But go ahead. This was not a warrant for the neighborhood of Kent Bottom. So you explain that, you explain that what you call a neighborhood and because you've limited. But I think the car thing is very important in that to me because that's where you had no limitation at all. Granted, the house, well, at least you got an address. And you said Desmond was coming in and out of there. But I heard nothing about it ever coming in and out of several cars at all in the warrant at all. And therefore, in that sense that it was very broad. The person was associated just with that house that would look to be in front of a car that there's so many feet of. But 20 cars, you really were trying to find anybody would be swept up in that. So it's not a matter about whether or not somebody's good or bad. People always talk about Leon as if you got to be. No, I'm not saying police officers are good or bad. The question is constitutionality or not in terms of good faith, in terms of how you draw it. So I mean, it's people really believe that. Look, I think I need to do this because this helps be a law enforcer. That's not bad. But it might be beyond what the Constitution protects. That's the question. So it's not about them aligning it. It's about them saying, are you calling police? No, we're not calling police. They do a great job. We need them. They protect us. But the Constitution protects all of us too. Go ahead. Can I ask you about the ACCA question? I don't want to. Oh, sorry. Judge Benjamin, go ahead. No, you can go ahead. I had a question about, I wanted to ask about the ACCA. Oh, I do too. Judge Benjamin, go ahead. My question is about that. It's probably the same thing. How do you, on the, I guess it's Erlinger error, it's my understanding the government is conceded there was an error here. But you're, this argument that it's harmless. And then my, I guess the second part of my question is, how is this different than Cogdill, where they, in terms of the occasions? Yes, Your Honor. The occasions are different because of the intervening arrests in this case. That's just one of the factual distinctions. Obviously, also. Isn't it also a really big difference that that was a preserved error case and this is not?   But in terms of the, so the standard, obviously, is very different too. But the facts are different. There was, in Cogdill, there was scant evidence. Here we have more than scant evidence of what had occurred. And also, we have the intervening arrests between each of them. I think, as my colleague, Mr. Bornstein, put it in the papers. He put it well when he talked about the plain language of what occasions mean, the common usage of the word occasions, that no one would look at the three occasions separated in the way that they are this way factually, using the phrase for the word occasions, and believe that it could occur on a single occasion. And in fact, if someone heard you colloquially saying that, they would think that individual doesn't understand what the word occasion means. The question I was going to ask was about the other ACCA question. I guess I'll just say that I'm really concerned that, had we not issued a supplemental briefing order, we might have made a legally incorrect decision based on a concession that the government inexplicably never took back during a, I don't know, like one year period. What happened there? No, to your honor, that was not a best practice. And what happened there was we didn't really have an objection, necessarily, to the content of the 28J letter that the appellant had brought to the court's attention. Likely should have, as a best practice, and obviously we're invited to under 28J to have further expounded on that, but we did not. It's like, in light of that, the thing that we said in our brief, we don't think that's true anymore? Because it was contingent, your honor, yes. And it wouldn't have taken much for us just to say that, your honor, this was contingent. And we believe that contingency now has kicked in. And we could have done that, your honor.  I see that I'm well past time, unless the court has any further questions for me. I ask that the testimony be affirmed. Thank you. Thank you, Mr. Hayden. Mr. Burma, you have some time. Thank you, your honor. Let me return back to the probable cause and good faith questions. Because I do think that any good faith has to be limited to whether it was objectively reasonable to believe that there was probable cause shown as the 6740. In fact, the government, in its pleadings in the district court, and it's a joint appendix 115, said- Counsel, let me ask you a question. Does it matter, in terms of the probable cause, as we're discussing the gun, that the car that was- the car to search, I guess, with the gun that you're requesting to be suppressed, does it matter that it was right next to the house? I think it does, your honor. Because this is sort of what the government conceded, said in the district court. They said it would be nonsensical to suppose the warrant allows for search of all the vehicles in the open-air drug market and the 6740 residents, except for the vehicles that are on the curtilage of the 6740 residents. And that's where this vehicle was. It was on the curtilage of the 6740 residents. So this has to be measured by whether or not there was probable cause for the 6740 residents and whether it was objectively reasonable for them to believe that there was probable cause for the 6740 residents. And for all the reasons we've discussed previously, we submit there was not probable cause and it was not objectively reasonable to believe that there was. Let me turn back, if I could, to Mr. Hagan's comments concerning the August 9, 2019 events involving Desmond Griffin. Beginning at Joint Appendix 47, continuing on to 48, all it talks about is how the remainder of the surveillance on August 9, there was significant vehicular traffic in and out of Kent Bottom, significant foot traffic coming from multiple residences and areas throughout Kent Bottom, additionally, multiple people coming and going out of vehicles parked along the road. I mean, that could describe almost any scenario, but it certainly doesn't describe a drug transaction. And there is no drug seizure, no drug arrest, no drugs found. And then they talk about how Desmond Griffin, this is Joint Appendix 48, Desmond Griffin was present at Kent Bottom during several suspected, and again, non-confirmed, CDS transactions and seen walking in and out of the residence of 6740 before and or after the transaction. But what transactions? I mean, these are suspected transactions. And I would submit to the court that observing somebody near suspected transactions away from the 6740 residence, and then the fact that at some point during the day, he walks in and out of that house, that does nothing to establish probable cause that contraband would be found at 6740 or the vehicles outside of it. And I really don't think I need to gild the lily with regard to Judge Gregory's comments regarding not imputing neighborhood guilt to everyone in the neighborhood. You wrote US versus Black, and you wrote your opinion in Curry, and I have nothing to add to that. Well, then, can I add to that? Because I guess I look at this picture, and I totally understand when that argument is made in the context of city blocks, or large apartment complexes, or things like that. But we're designing the case before us. And what I'm looking at here looks like what we might generally call a compound that is basically, in some sense, a closely— even if this driveway is ostensibly a public street, it doesn't seem very public street-y to me. Would you respond to that? Well, I don't really think that that affects the Fourth Amendment analysis with regard to the 6740 residents. I mean, if 6750, or if one of the other residents is referenced in the warrant, has drug trafficking there, that, I don't think, should be imputed to the 6740 residents as a specific piece of property, any more so than drug trafficking in apartment 22 of a building should be imputed to apartment 21, or that anything in a house should be imputed to the house next door. I just don't think that the distinction between compound, or apartment building, or urban neighborhood makes any difference to the Fourth Amendment analysis. They still need to show particularized, probable cause to the 6740 residents. Why isn't the big difference between this case and a city block or a large apartment building? It's like, one of the things we worry a lot about the city block or large apartment building situation is ensnaring all kinds of unconnected, unrelated, potentially likely, even sometimes completely innocent people, right? That we don't connect that. But, you know, one of the things that this affidavit, I think, does a fairly good job is saying, for purposes of what appears to be a large outdoor drug market that's been going on for years, these are all basically one place for purposes of that. Like, that's what I sort of understand the government's argument to be, which seems quite different from, I mean, I guess it's not in theory impossible that you could have an affidavit saying an entire city block, but it seems like what you would need to do that is extraordinary. I mean, I guess I've never seen an affidavit that actually tries to do that. So what's your response to that? My response, Your Honor, is that I think even the affidavit itself recognizes that it could not and did not seek to establish probable cause for everything within the compound. It was limited to 6740, it's the Joint Appendix 32, 6740 in paragraph A and 6790 and 6738 in paragraph B. But, you know, we're implicitly recognizing there are other houses in the neighborhood that are in the compound that are not involved in drug trafficking. And I just think it is, for the Fourth Amendment matter, it would certainly be inappropriate to impute probable cause to those houses simply because they're in the same compound. In fact, the police didn't even try to do that. So unless, I believe that covers everything that Mr. Hagan raised on the probable cause issue. As to the Erlinger issue, I would simply note that it was the position of the government throughout this case that Mr. Griffin was a mid-level dealer in an ongoing drug operation. That's what their expert, Mr. Howard, Detective Howard testified to in Joint Appendix 719, 722, 723. If I could just have a few seconds to finish this thought. That's what Mr. Hagan said, and it's open and closed, that Mr. Griffin used the Monte Carlo vehicle to package drugs, and the Tahoe as a stash spot. That's at Joint Appendix 821, 827, 828. And the government said in rebuttal, Mr. Griffin's a mid-level dealer. We use the Tahoe as a safe deposit box at Joint Appendix 883, 885. I think the same thing applies to their, should be applied to their analysis of the 2014, 2015 convictions that get them over the line to three for ACCA. It was an ongoing operation, and one reasonable juror could have found reasonable doubt about whether or not Mr. Griffin did that conduct simply as part of one ongoing drug scheme. I would ask the court to reverse on the suppression issue, reverse on the sufficiency issue, and vacate on the ACCA sentence. Thank you. Thank you. Mr. Berman, I note that you're a court opponent. On behalf of the Fourth Circuit, thank you for doing that. We rely on lawyers like yourselves, and the work that you do to help us on these cases, and we much appreciate it. Of course, Mr. Hagan, we note your able representation of the United States of America. And with that, we can't come down and greet you, but know that our virtual greeting is just as strong and sincere. Thank you, and be careful in the weather. Take care. Thank you, Your Honor. Thank you. With that, clerk, would you please adjourn the court until tomorrow? This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, Toby J. Heytens, DeAndrea Gist Benjamin